[Crim. No. 19844, Second Dist., Div. Five. Nov. 24, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN GUERRA, Defendant and Appellant.

[Crim. No. 19884. Second Dist., Div. Five. Nov. 24, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNESTO C. ALCALA, Defendant and Appellant.

(Consolidated Cases.)

**COUNSEL**

Don W. Goldstein, under appointment by the Court of Appeal, and Howard E. Beckler for Defendants and Appellants.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, Ronald S. Marks and William K. McCallister, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—Defendant Alcala appeals from a conviction for possession of heroin (Health & Saf. Code, § 11500). Defendant Guerra appeals from

convictions of receiving stolen property (Pen. Code, § 496)[1] and possession of a restricted dangerous drug (Health & Saf. Code, § 11910). There is no need to detail the procedural facts at this point. To the extent that they are relevant to an issue on appeal, they will be set forth in connection with our discussion of the issue.

## FACTS

Since the most important question on this appeal is the legality of police conduct which resulted in the seizure of certain physical evidence, we set forth the facts preceding and surrounding that seizure.

Officer Wanek of the Los Angeles Police Department had been investigating Guerra for some time. He had arrested several people for possession of heroin who told him that they had purchased it from Guerra. He had information that Guerra had a "stash pad," and that several people would go there at late hours to cut up heroin. He was also informed that Guerra was on parole for possession of marijuana. Wanek knew Guerra's car and its license number. On one occasion after he had arrested a person who was in possession of heroin after leaving a location where Guerra was, Wanek had obtained a search warrant. Apparently the search was fruitless.

Between 1 and 2 a.m., on January 26, 1970, Wanek received a phone call from Sergeant Moore informing him that somebody was in Guerra's apartment. Wanek and Lieutenant Sherwood went to an apartment house at 2202 Victory Boulevard. There they met Sergeant Moore. They went to apartment C through a common hall, having received the manager's permission to do so. Wanek placed his ears to the door in the area of the hinges and possibly at the area of the peep hole and heard a female voice say: "I can't hit. Would you fix me?" A male voice answered "I'll do it." Another male voice asked "How much stuff is left?" He received an answer, again by a male voice: "I'm not sure how many we sold." Wanek also heard the word "quarters" used at least three or four times. The officer, whose expertise in narcotics and drug technology and language was stipulated to, then formed the opinion that heroin was being used by one person inside the premises. He had also heard a snapping sound, similar to cards being shuffled, but not quite the same. After discussing the sound with another officer, he came to the conclusion that it was caused by someone chopping heroin and mixing it with milk sugar. Wanek then knocked and announced: "Police officer. Narcotics investigation. Open the door." A male voice inside said: "It's the cops. Get rid of the stuff." This was followed by a loud banging noise and footsteps.

---

[1]This conviction rests on a guilty plea.

Before arriving at the premises Wanek had heard of a shooting incident at Guerra's home—he did not live at the apartment in question—in which Guerra was either shot or had shot someone else. After that incident several loaded weapons had been taken from the home.

The officers then broke the door open. Inside the apartment Alcala was seen running toward Wanek. As the door came open Alcala turned away from Wanek and threw a large bundle of currency that he had in his right hand toward a chair. Alcala was arrested. A hypodermic syringe, a spoon and three balloons[2] were seen. Wanek then entered a bedroom where Guerra was found in bed with a lady. Guerra was arrested. When an officer handed him his trousers a plastic sack containing red capsules, later identified as seconal, was taken from a pocket.

Guerra was then asked for permission to search the premises. After being allowed to consult with his attorney by phone, such permission was granted. The search revealed Benzedrine, rifles, handguns, milk sugar, 100 empty balloons and narcotics paraphernalia of various kinds. Three of the rifles had been stolen from their owners during the preceding year.

 On appeal Guerra makes but one contention: that by eavesdropping at the apartment door the police violated his constitutional right to privacy. (*Katz* v. *United States,* 389 U.S. 347, 351-353 [19 L.Ed.2d 576, 581-583, 88 S.Ct. 507].)

Alcala naturally raises the same issue. In addition he claims that the evidence does not support his conviction and that his constitutional rights were violated by the manner in which his case was submitted to the trial court.

## DISCUSSION

Neither counsel nor we have found a post-*Katz* case which is factually precisely in point: that is to say, a case where it clearly appears that the investigating officers could not understand what was being said inside of a home or an apartment, without going to the lengths of eavesdropping testified to by Officer Wanek in this case. Thus, while *United States* v. *Llanes,* 398 F.2d 880 contains broad language which would remove any eavesdropping that is not mechanically or electronically aided from the protective ambit of *Katz,* the facts of the case do not necessitate its sweeping language. There, the voices that were heard were loud enough to be understood by anyone present outside the door without the need of putting an ear against it.

---

[2]The balloons were later established to contain heroin.

Lacking authority precisely in point, we look for analogy. We find the cases which permit the police to peek through small openings provided by imperfectly drawn curtains or blinds, to be persuasive. The leading case is, of course, *People* v. *Berutko*, 71 Cal.2d 84, 91 [77 Cal.Rptr. 217, 453 P.2d 721], where the officer, without committing trespass, made certain observations through a window. What made it possible for him to make these observations was the fact that the bottom of a drape rested against the top of a table, which apparently caused the drape to bulge.

To the same effect are cases such as *People* v. *Cooper*, 17 Cal.App.3d 1112 [95 Cal.Rptr. 471] (view of apartment gained from fire escape); *People* v. *Galfund*, 267 Cal.App.2d 317, 319 [72 Cal.Rptr. 917] (imperfectly closed venetian blind); and *People* v. *King*, 234 Cal.App.2d 423, 426 [44 Cal.Rptr. 500] (opening of approximately one and one-half to two inches).

We are aware that in *People* v. *Foster*, 19 Cal.App.3d 649 [97 Cal.Rptr. 94] the court assumed for the sake of argument that listening at an apartment door might be constitutionally improper. It was, however, just that: an assumption for the sake of argument.

While we have said that none of the authorities dealing with conversations that could be heard outside of an apartment without putting one's ears against the door were in point, this much is true: if an individual desires that his speech remains private, he can easily assure himself of privacy by whispering, so that even a person in Wanek's position cannot hear him. Since it does seem established by respectable authority that speech which is loud enough to be understood by anyone outside is not protected, it would seem rather arbitrary to draw a constitutional line somewhere between the whisper and the shout.

If we are right so far, this disposes of Guerra's appeal. We now turn to the two additional contentions made by Alcala.

■ Alcala claims that the submission on the transcript was but a "slow plea of guilty" and that the requirements of *In re Mosley*, 1 Cal.3d 913 [83 Cal.Rptr. 809, 464 P.2d 473] were not met. In particular he claims that he was not advised of the "permissible range" of punishment.

Preliminarily it should be said that we are not as certain as Alcala's counsel that this was a slow plea of guilty. He, at all times, retained the right to argue that the evidence was insufficient for conviction. We would feel better about it, however, if his trial counsel had actually so argued. The only resistance to a conviction which was before the court was the report of a fairly vigorous argument to the magistrate at the time of the

preliminary hearing. We will assume that, realistically, Alcala pleaded guilty.

The only support for the contention that a guilty plea is invalid if the record does not affirmatively show knowledge of the permissible punishment is a footnote in *In re Tahl,* 1 Cal.3d 122, 133, footnote 7 [81 Cal.Rptr. 577, 460 P.2d 449]. There the Supreme Court quotes a passage from *Commonwealth* ex rel. *West* v. *Rundle,* 428 Pa. 102, 105-106 [237 A.2d 196]. In essence it is to the effect that in order to insulate a conviction from collateral attacks the record should expressly show—among other things—that the accused is aware of "the permissible range of sentences." The Supreme Court notes—still in the footnote—that similar requirements have long been required in California if an accused desires to proceed without counsel. It adds: "Our holding today may thus be seen as an extension of the concepts first developed in those cases." Yet, strangely, in *In re Mosley,* 1 Cal.3d 913, 926, footnote 10 [83 Cal.Rptr. 809, 464 P.2d 473], where the Supreme Court lays down guidelines for future submissions which are tantamount to pleas of guilty, it merely states that such submissions "must be accompanied by an affirmative showing on the record that the defendant waives his right to freedom from compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers." It seems to us that if the Supreme Court had thought that "slow pleas" are invalid unless the record affirmatively shows that the defendant is aware of the range of punishment, it would have said so.[3]

True in *Tahl,* the court in interpreting *Boykin* v. *Alabama,* 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709] stated: "The quoted language, while not establishing precise guidelines, makes clear that a plea of guilty cannot stand unless the record in some manner indicates a free and intelligent waiver of the three enumerated rights necessarily abandoned by a guilty plea *and an understanding of the nature and consequences of the plea.*" (*In re Tahl, supra,* 1 Cal.3d at p. 130. Italics added.) Clearly the nature and duration of the punishment which the court can impose as a result of the plea is one of its consequences. Yet so are many other matters, such as the loss of civil rights or the effect of a conviction in future prosecutions. We feel that any holding to the effect that the record must expressly show that the accused is aware of the precise penalty which may follow his plea, should come from the Supreme Court.

---

[3]We realize that in *McCarthy* v. *United States,* 394 U.S. 459 [22 L.Ed.2d 418, 89 S.Ct. 1166], the United States Supreme Court made such an express showing a requirement in federal prosecutions. *McCarthy,* however, is an interpretation of rule 11 of the Federal Rules of Criminal Procedure, not of the Constitution. (See *Halliday* v. *United States,* 394 U.S. 831, 832 [23 L.Ed.2d 16, 19, 89 S.Ct. 1498].)

We might add that as a practical matter we have little doubt that Alcala knew perfectly well what he was facing. The proceedings at the time of the submission had all the earmarks of the kind of carefully staged ritual so customary before the Supreme Court in *People* v. *West,* 3 Cal.3d 595, 604-614 [91 Cal.Rptr. 385, 477 P.2d 409], brought plea bargaining out into the open. It is inconceivable that somewhere along the line Alcala did not express a very personal interest in the time he might have to spend in prison.

Perhaps in vew of what we have just said and our holding in *People* v. *Cook,* 19 Cal.App.3d 405 [96 Cal.Rptr. 860], we should not even discuss whether the evidence supports the conviction. We shall, nevertheless, do so.

■ Alcala argues, of course, that he was not in actual possession of the heroin, and that the facts demonstrated merely access. We do not agree. First, it appears that there were only two males in the apartment and that both were engaged in conversation which indicated some relationship to the heroin. Second, it was up to the trier of fact to determine whether Alcala's activities after the officers entered the room portrayed a guilty conscience with respect to the contraband.

## DISPOSITION

At the time when Guerra pleaded guilty to receiving stolen property and was found guilty of the violation of section 11910, other counts against him were not disposed of. By apparent inadvertence they were not dismissed at the time of sentencing. Upon the filing of the remittitur in the superior court, they should be so dismissed.

Each judgment is affirmed.

Stephens, J., and Reppy, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 19, 1972. Peters, J., was of the opinion that the petition should be granted.